IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 13, 2020

## STATE OF TENNESSEE v. HOWARD STEWART

**Appeal from the Circuit Court for Lawrence County
No. 34752    Stella L. Hargrove, Judge**

_____

## No. M2019-01421-CCA-R3-CD

_____

The Defendant, Howard Stewart, was convicted by a Lawrence County Circuit Court jury of first degree premeditated murder and theft of property valued at $10,000 or more but less than $60,000, a Class C felony. *See* T.C.A. §§ 39-13-202 (2018) (first degree murder), 39-14-103 (2018) (theft), 39-14-105 (2018) (grading of theft). The trial court modified the Defendant's theft conviction to theft of property valued at $1,000 or less, a Class A misdemeanor, and imposed concurrent sentences of life imprisonment for first degree murder and eleven months, twenty-nine days for theft. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by admitting inadmissible hearsay evidence, (3) the court erred by admitting two photographs of the victim, and (4) the cumulative error of the evidentiary issues entitles him to a new trial. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Brandon E. White (on appeal), Columbia, Tennessee; Travis Jones, District Public Defender; and Robert Stovall and Craig Moore (at trial), Assistant District Public Defenders, for the appellant, Howard Stewart.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Brent A. Cooper, District Attorney General; Gary Howell and Christy Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to an August 2017 domestic dispute, in which the Defendant struck the victim, Barbara Lois Harris, multiple times with a hammer. She

suffered fatal blunt force trauma to her head. The Defendant does not dispute that his conduct caused the victim's death.

At the trial, Hannah Pruett testified that she and the victim had attended the same church, that they had been close friends, and that they had known each other for about ten years. Ms. Pruett said that at the time of the victim's death, she visited the victim's home once every two weeks. Ms. Pruett said that on August 30, 2017, around 10:30 or 11:00 a.m., she received a text message from the victim's cell phone asking if the victim's younger daughter could ride the bus to Ms. Pruett's home after school because someone in the Defendant's family had been in an accident. Ms. Pruett agreed to care for the victim's daughter after school and requested permission to take the victim's daughter to church that evening. Ms. Pruett said that the victim agreed and asked, "What do I need to tell the school so [the victim's daughter] gets on the right bus." Ms. Pruett said that she provided her address to the victim and stated that the victim's daughter could ride the bus with Ms. Pruett's two younger brothers, who attended the same school. Ms. Pruett said that the next message stated, "Last name? Mind went blank. LOL." Ms. Pruett said that the victim "always knew" her last name and that, at the time, she thought the victim had been merely upset. Ms. Pruett said she received a message stating the victim would not be able to pick up her daughter until 10:00 or 11:00 p.m., that Ms. Pruett offered to allow the victim's daughter to stay overnight, and that the victim thanked her.

Ms. Pruett testified that after the victim's daughter arrived from school, Ms. Pruett received a text message from the victim's cell phone instructing Ms. Pruett to tell the victim's daughter that the victim could not "talk on the phone in here." Ms. Pruett recalled that the victim's daughter sent text messages to the victim's phone after the victim's daughter arrived. Ms. Pruett said that the victim wanted to know if something was wrong and that Ms. Pruett said the victim's daughter only wanted to "check on y'all." Ms. Pruett said that the victim said she would call her daughter when "we head back," that the Defendant's mother should be released from the hospital by 9:30 p.m., and that her daughter should "get some sleep."

Ms. Pruett testified that after a "time gap," she sent a text message to the victim's cell phone, in which she asked the victim to call Ms. Pruett's cell phone in order for the victim's daughter to speak with the victim and to know "y'all are okay." Ms. Pruett said that the victim's daughter was worried. Ms. Pruett said that she sent a message asking the victim to step outside the hospital and that the victim responded, "We're on the fifth floor in a bad town, that's why I won't go outside. I need her to understand that. Please explain it." Ms. Pruett said that she began to question whether it was the victim sending the messages because the victim would not answer the phone for her daughter and because the victim had "never pushed [her daughter] away like that." Ms. Pruett said that she performed a Google search for the hospital and learned it was a one-floor hospital in Mississippi. Ms. Pruett said she became more concerned.

-2-

Ms. Pruett testified that after another time gap, she received a text message from the victim's cell phone asking if the victim needed to pick up her daughter when they returned with the Defendant's mother. Ms. Pruett said that she asked the victim to call her home telephone "real quick" and that the victim's response was that the victim had attempted to call "a little bit ago" but was unable to "get a call to go through," that she was not going outside with the Defendant, and that the Defendant's cousin heard gunshots the last time the cousin went outside the hospital. Ms. Pruett said that she instructed the victim to call as soon as she left the hospital regardless of the time and that the response was "Okay." Ms. Pruett said that after midnight, she sent a message to the victim's phone asking if the Defendant's mother had been released from the hospital. Ms. Pruett said that she received a message stating, "Not fully. [The victim] is asleep," and that Ms. Pruett assumed the Defendant sent the message. The next message from the victim's phone stated, "Letting her sleep some before heading home because I am going to be driving my truck and she is going to be driving her truck so I don't want her falling asleep at the wheel, if that makes sense." Ms. Pruett said that she requested the victim call because the victim's daughter wanted to know the victim was okay. Ms. Pruett said that the Defendant responded, "She is perfectly okay. It really hurts my feelings thinking I'm not going to keep her safe. Going to be some changes after I have proven everything to [the victim]!! Got [the victim's daughter] her own Side by Side and trying our best to keep it a secret until tomorrow. Don't tell her, though." Ms. Pruett explained that the Defendant had referred to a "four wheeler type thing."

Ms. Pruett testified that after sunrise, she received a text message from the victim's cell phone that "things" were "great" and that "we will be pulling out shortly." Ms. Pruett said she asked the victim to call and that the next messages from the victim's phone were an inquiry about whether the victim's daughter went to school and an instruction to stop "thinking bad about [the Defendant]." Ms. Pruett said that she did not receive a response to her request that the victim call and that, as a result, Ms. Pruett sent a message stating that she would call the victim's former husband if the victim did not call within ten minutes. Ms. Pruett said that she received a message stating that the victim would call when cell phone reception improved. Ms. Pruett said that she repeated she would call the victim's former husband if the victim did not call within ten minutes and that Ms. Pruett received a message stating, "Don't give me time frames and don't call my ex." Ms. Pruett said that the next message stated that the victim would arrive at Ms. Pruett's home between 12:30 and 1:00 p.m. Ms. Pruett said that, at approximately 11:00 a.m., she called the victim's former husband, who was also the father of the victim's two daughters.

Ms. Pruett testified that her father and the victim's former husband came to her home and that she, her father, the victim's daughter, and the victim's former husband went to the victim's home because the victim's daughter needed clean clothes. Ms. Pruett said that the victim's Dodge truck was not at the home and that the truck was the

only vehicle the victim and the Defendant drove. Ms. Pruett said that the victim and the Defendant were involved romantically and that the Defendant lived with the victim. Ms. Pruett said that the victim's former husband forced the back door open, that everyone went inside, and that they called out the victim's name. Ms. Pruett said that the victim's daughter and former husband went to the victim's daughter's bedroom and that Ms. Pruett and her father went to the living room. Ms. Pruett said that the home was dark, that she turned on a flashlight, that she saw "covers bundled up on the couch," and that she saw a "foot sticking out of the covers." She said that she took the victim's daughter out of the home. Ms. Pruett identified photographs of the victim's home, which included a photograph of blankets covering a couch and of a foot. Ms. Pruett said that the victim and the Defendant had three inside dogs but that the dogs and the pet carriers were not in the home.

Ms. Pruett testified that she and the victim confided in each other and that a few weeks before the victim's death, she and the victim discussed the victim's relationship with the Defendant. Ms. Pruett said that she and the victim were riding in the victim's truck and that the victim said she "wanted to . . . get a bus ticket and send [the Defendant] back to Mississippi." Ms. Pruett recalled that the victim had recently held a couple of yard sales and stated that the victim told her the yard sales had been to raise money to purchase a bus ticket.

On cross-examination, Ms. Pruett testified that she met the Defendant around April, although the Defendant had been living at the victim's home for several months. Ms. Pruett said that before the Defendant began living at the victim's home, the victim lived with the Defendant in Mississippi. Ms. Pruett said that the victim and the Defendant drove to Mississippi at least once after they began living in the victim's home. Ms. Pruett was unaware of an incident in which the victim and the Defendant fought when in Mississippi, the victim left the Defendant in Mississippi and returned to Tennessee, and the victim returned to Mississippi three or four days later to pick up the Defendant.

Ms. Pruett testified that the victim expressed her "reservations" about her relationship with the Defendant around July. She agreed that the victim's and the Defendant's relationship problems were related to money and that they were attempting to operate a "little wood working business" out of the home. Ms. Pruett agreed that she did not initially tell the police that the victim and the Defendant had relationship problems, that they had argued about money, and that the victim had discussed ending the relationship. Ms. Pruett said she first told the police about this two months before the trial, which occurred two years after the victim's death. Ms. Pruett agreed that she never saw a bus ticket and that the victim never said she had purchased a ticket.

-4-

Ms. Pruett testified that the victim's truck was "in pretty good shape," although she did not know the model. Ms. Pruett could not estimate the value of the truck. She said that the Defendant drove the victim's truck on occasion and that she had seen the Defendant drive it twice. Ms. Pruett agreed that the Defendant had the victim's permission to drive the truck and that it was treated as "their" truck.

Ms. Pruett testified that the victim's Facebook postings did not mention relationship problems. Ms. Pruett said that she and the victim discussed the victim's relationship problems at least twice.

On redirect examination, Ms. Pruett testified that the victim's younger daughter stayed overnight with her on Wednesday; that Ms. Pruett, her father, the victim's daughter, and the victim's former husband went to the victim's home on Thursday; and that the Defendant was arrested on Friday. Ms. Pruett said that she learned the Defendant confessed to killing the victim one month before the trial. On redirect examination, Ms. Pruett said that the victim's home looked clean, as though nobody had "messed with it." She agreed that she did not see signs of a fight or a struggle.

Robin Walls, Ms. Pruett's father, testified that on the evening of August 30, 2017, he and his daughter discussed the text messages sent from the victim's cell phone. Mr. Walls recalled that his daughter did not think the victim was the person sending the messages. Mr. Walls said that he tried to calm his daughter and that he told her everything would make sense the next day. Mr. Walls said that he drove to his daughter's home around 8:30 or 9:00 a.m. the next morning. Mr. Walls said that he suggested sending the message in which Ms. Pruett stated she would call the victim's former husband if the victim did not call within ten minutes. Mr. Walls said that his daughter knew the victim had not sent the messages because the victim always referred to her former husband by name and did not refer to him as her "ex."

Mr. Walls testified that after the victim's former husband arrived at Ms. Pruett's home, Mr. Walls, Ms. Pruett, the victim's younger daughter, and the victim's former husband went to the victim's home to obtain clothes for the victim's daughter. Mr. Walls said that the victim's daughter saw the victim's purse inside the home and that Mr. Walls knew the victim would not have left town without her purse. Mr. Walls said that he entered the living room, which he described as "totally black," and that "blankets and stuff" were covering the windows, which prevented anyone from seeing through the windows. Mr. Walls recalled that the victim liked natural light. He said that, with the aid of a flashlight, he saw the victim on the couch covered with blankets and that the victim's foot stuck out from under the blankets. He said that he told his daughter to take the victim's daughter outside and that he and the victim's former husband yelled at the victim to determine if she were asleep. He said that the victim did not move, that they went

outside, and that he called the police. A recording of the 9-1-1 call was played for the jury.

On cross-examination, Mr. Walls testified that after the victim and her former husband divorced, the victim moved to Mississippi "to be in a relationship" with the Defendant. Mr. Walls thought that the victim had been "talking" to the Defendant before the divorce was finalized. Mr. Walls said that the truck belonged to the victim, not the victim's former husband. Mr. Walls said that he did not know the Defendant personally and that he did not know if the victim gave the Defendant permission to drive her truck.

Kayla Harris, the victim's older daughter, testified that on the afternoon of August 30, 2017, she sent her mother a text message and that she received a message stating, "Seeing about [the Defendant's] family. Love ya, too." Ms. Harris said additional messages stated that the Defendant's parents had been in a car accident in Wesson, Mississippi, that the Defendant's mother would return to Tennessee after her release from the hospital, and that the victim would call when they left the hospital. Ms. Harris explained that when the victim and the Defendant began dating, the Defendant told the victim and Ms. Harris that "both of his kids and both of his parents died in a tragic crash" and that he was waiting to receive an eight million dollar insurance settlement. Ms. Harris said that the victim confirmed in messages that the Defendant "was loaded," that the victim saw "some digits on paper," and that the victim spoke "to the bank to verify." Ms. Harris said that the messages from her mother were unusual because the Defendant told the story about his family being deceased. She said that she and the victim learned later that his family was alive and did not have contact with the Defendant. Ms. Harris said that she knew the victim and the Defendant did not go to Mississippi to see the Defendant's family. Ms. Harris said that the messages were also unusual because she asked twice about the type of accident before she received a response.

Ms. Harris testified that the next morning, August 31, 2017, she received a text message from her younger sister stating that she had been at Ms. Pruett's home since the previous day and that the victim was not answering her cell phone. Ms. Harris said that the victim always answered her phone. Ms. Harris sent a message to her mother stating that Ms. Harris had spoken to her younger sister and that Ms. Harris was going to call the police to report the victim missing if the victim did not call immediately. Ms. Harris said she received a response stating that cell phone reception was poor and that Ms. Harris demanded the victim send her location to Ms. Harris. Ms. Harris received a message stating, "Don't screw up what's finally come true for me." Ms. Harris said that she attempted to call the victim's phone but that the phone rang for a long time. Ms. Harris said she sent a message to the victim's phone stating that she told her younger sister to call their father. Ms. Harris said she received a response stating, "No. I didn't tell her to call Henry." Ms. Harris said that the victim never referred to Ms. Harris's father by name and that the victim always referred to him as "Your Daddy."

Ms. Harris testified that she was age eighteen when her parents divorced but that her younger sister was a minor. Ms. Harris said she lived on the same street as the victim and her younger sister.

On cross-examination, Ms. Harris testified that she met the Defendant when she and her mother drove to Mississippi to pick up the Defendant. Ms. Harris denied driving the Defendant to Mississippi but said that, in February 2017, she and the victim drove him to Natchez Trace when the Defendant learned his parents were alive. Ms. Harris said that after the victim and the Defendant argued "about something," the Defendant wanted to return to Mississippi, that the victim did not speak to the Defendant for a few days, that the victim and the Defendant "eventually started talking . . . again," and that the victim drove to Mississippi to pick up the Defendant to bring him to Tennessee. Ms. Harris was unaware of any other incidents in which they argued and the Defendant left for a few days. Ms. Harris said that the Dodge truck belonged to the victim and that the victim allowed the Defendant to drive the truck to Clark's Grocery.

Kyle Clark testified that his family owned Clark's Grocery and Hardware and that he and the victim lived on the same street. Mr. Clark said that he met the Defendant at the store, that the Defendant bought lumber, that they talked, and that the Defendant "seemed like a real nice guy." Mr. Clark said that on August 31, 2017, he received a text message from the Defendant's cell phone stating, "This is [the victim]. Is anyone at my house." Mr. Clark explained that he was home when he received the message, that he could see the victim's home, and that he responded, "Not that I see. There's no vehicles there." Mr. Clark said that the next message stated the victim's son was "back stealing again" and that he responded he would let the victim know if he saw anyone at her home. Mr. Clark said that later on in the day, he saw three or four police cars at the victim's home. Mr. Clark said that he called the Defendant's phone, that the Defendant did not answer, and that he received a message from the Defendant's phone stating that he had poor cell phone reception and to "just text." Mr. Clark said that he sent a message stating that the police were at the victim's home, the police were talking to someone, and that a white Dodge truck was at the home. Mr. Clark received a message asking, "What in the world is going on? Just standing in the yard?" Mr. Clark sent a message stating the police were inside the home and putting up police tape. Mr. Clark said that he did not receive any additional messages.

On cross-examination, Mr. Clark testified that he had known the victim three or four years and that he had known the Defendant for one year. Mr. Clark said that the victim and the Defendant appeared to be a happy couple and that they did not appear to have relationship problems. When asked if he knew the victim and the Defendant had financial difficulties, Mr. Clark said that the Defendant bought lumber at the store by putting "it on a tab" and paid the debt after the Defendant sold the lumber. Mr. Clark said the Defendant never had problems paying the debt.

Mr. Clark testified that after he learned what happened to the victim, he walked to the victim's home to show the police his cell phone. Mr. Clark said that he was "shocked" to learn the Defendant had killed the victim because "everything seemed normal." Mr. Clark said that he never thought the Defendant was capable of striking the victim's head with a hammer.

Lawrence County Sheriff's Corporal Ben McDow testified that he responded to the victim's home, that he spoke to the victim's family members, and that he entered the home. He said that he saw the victim's body on the couch, that she was covered with blankets, and that he could see her foot. He said that he attempted to remove the blankets from her head in order to identify her but that the amount of blood prevented an identification.

On cross-examination, Corporal McDow testified that he spoke to Mr. Clark at the scene during the investigation and that Mr. Clark reported receiving text messages from the Defendant. Corporal McDow agreed that the Defendant knew the police were at the home. Corporal McDow said that nothing stood out about the condition of the home and that "things were in their place." He agreed that other than the victim and blood spatter, he saw no signs of a physical altercation inside the home. He did not recall blankets covering the windows of the home. On redirect examination, he said that he did not find any dogs inside the home, although pet carriers were inside the home.

Neshoba County, Mississippi, Sheriff Tommy Waddell testified that he received a telephone call from an investigator at the Lawrence County Sheriff's Office about the victim's homicide and that the investigator had traced the Defendant's cell phone to a location in Neshoba County. Sheriff Waddell said that he determined the phone was located at the Silver Star Casino. He said that the investigator provided him with the Defendant's description and the license plate number of the victim's truck. Sheriff Waddell said that he sent deputies to the casino, that they found the truck in the parking garage, and that they apprehended the Defendant when he approached the truck.

Sheriff Waddell testified that he spoke to the Defendant after he advised the Defendant of his *Miranda* rights. Sheriff Waddell said that the Defendant acknowledged knowing why the deputies had detained him. Sheriff Waddell said that he asked about the victim's whereabouts, that the Defendant said the victim was in Lawrenceburg, and that the Defendant said the victim was dead. Sheriff Waddell said the Defendant reported that he and the victim had argued, that "it went too far," and that he struck the victim with a hammer "a couple of times." Sheriff Waddell said that he inquired about the hammer and that the Defendant thought it was in a field at the edge of the yard or inside the home. Sheriff Waddell said that the Defendant did not provide any details about the subject of the argument.

Sheriff Waddell testified that the truck was taken to the Neshoba County Detention Center and later taken to Lawrence County. He said the Defendant had two or three cell phones.

On cross-examination, Sheriff Waddell testified that the Defendant was apprehended "shortly after lunch" and that the Defendant did not resist, was respectful, and was cooperative. Sheriff Waddell said that the Defendant gave direct answers to questions and that Sheriff Waddell believed the Defendant was truthful. Sheriff Waddell recalled that the Defendant said the victim was on the couch. Sheriff Waddell stated that Lena, Mississippi, was near Neshoba County, Mississippi, and that the Defendant reported having family in Lena.

St. Joseph Police Department Chief Adam Brewer testified that at the time of the offenses in this case, he was a Captain with the Lawrence County Sheriff's Office. Chief Brewer said that he responded to the victim's home and that he saw the victim's body lying on the couch covered with blankets. He said that blood spatter was visible around the living room, that a dog was inside a pet carrier, and that the victim's family members were outside the home. Chief Brewer said he learned that Mr. Clark had exchanged text messages with the Defendant "about what was going on" at the victim's home and that the victim's family members had also received messages from the victim's cell phone. He said that he "pinged" the victim's phone in order to locate it, that initially the phone could not be located because it was either off or had a dead battery, and that the phone was later located in Philadelphia, Mississippi, the day after the victim's body was discovered. He said that the Defendant had the victim's phone at the time of his arrest.

Chief Brewer testified that the Defendant became a person of interest because he was not at the victim's home. Chief Brewer said that before the Defendant's arrest, an assistant at the sheriff's office created a "fake" social media profile in order to contact the Defendant. Chief Brewer said that the assistant and the Defendant communicated through social media.

Chief Brewer testified that on September 2, 2017, he and Investigator Daniel Kellum interviewed the Defendant. A portion of the recorded interview was played for the jury. In it, Chief Brewer asked for the Defendant's version of events. The Defendant said that he and the victim "had been struggling to pay the bills," that they argued about her former husband's "getting his stuff" from the victim's home, and that it "hurt [the Defendant's] feelings" to see the victim's former husband's belongings "all the time." The Defendant said, "I guess I just lost it. I really don't know. I mean, I've never been that way." He said that the argument began in the garage. Chief Brewer stated that he spoke with a realtor, who said the victim and the Defendant were "looking" to buy a home. The Defendant said that they were planning to buy a home with financial assistance from his family, who had "a little bit of money." The Defendant said he

looked forward to buying a home with the victim. The Defendant said, "I don't know what to tell you because I had never been that way . . . towards anybody. I mean, you see how I am." Chief Brewer agreed that the Defendant looked "mellow." The Defendant said, "I've just been f------ crazy the last few days."

The Defendant stated that the victim "kind of" scratched his arm and pushed him during the argument in the garage. He denied that the victim pushed him hard and said that they returned to the living room, sat on the couch, and began watching television. He said that they began arguing again about money, that he "just got up," and that he "went and got it" from the garage. He said that he did not know what made him "do that" to the victim and that he had not been himself for the last couple of months. He thought he "might need some help" but denied he was "a looney tune." He denied that he and the victim drank alcohol on the day of the argument, which he said began before lunchtime the day before the victim's body was discovered. The Defendant said that he was sorry and that it was difficult to think about "it."

The Defendant said that after he retrieved the hammer from the garage, he returned to the living room, that the victim said something, and that he struck her twice with the hammer. He could not recall the victim's statement and said it was "all cloudy." The Defendant said that the victim sat upright on the couch when he struck her. He said that he first struck the victim "right on the side." He said that "when I come back to my senses and realized what I did, that's when I covered her up." He said that he "freaked out" and left. He stated that the hammer was in the bathroom cabinet under the sink, that he was being honest with them, and that he hoped his honesty would "help [him] a little bit, as much as possible." He said that he drove to the coast when he left, that he was going to turn himself in to the police, and that he stopped in order to get some rest because he had not slept since leaving the victim's home.

Chief Brewer testified that he reduced the Defendant's interview to a written statement and that the Defendant read and signed it. The statement was received as an exhibit and read to the jury. In addition to the Defendant's statements in the recorded interview, the written statement reflected that the Defendant and the victim had dated for one year and that they lived on the Mississippi Coast before returning to Tennessee. The Defendant said that he was angry when he retrieved the hammer, that he struck the victim on the side and front of the head while she sat on the couch, and that she "slumped over." The Defendant stated that he struck her again and that the she "appeared unconscious." He said that he covered her with blankets because he "felt bad about what had happened." The Defendant stated that he sent Ms. Pruett a text message asking if the victim's younger daughter could spend the night and that he reported his family had been in an accident. He said that after Ms. Pruett agreed to care for the victim's daughter, he drove to the coast. He said that he drove to Gulfport, Mississippi, that he intended to surrender to the police, and that he stopped at a casino.

-10-

On cross-examination, Chief Brewer testified that he responded to the victim's home on Thursday, that he spoke to Mr. Clark about the exchange of text messages on Thursday, and that the Defendant was arrested on Friday. Chief Brewer said that the overall condition of the victim's home was clean and that he did not see signs of a struggle or fight. He said that the Defendant would have been required to walk through the kitchen to get to the garage, that the garage contained woodworking tools, and that the Defendant and the victim operated a woodworking business from the garage. Chief Brewer said that, based on the Defendant's statement, the Defendant struck the victim with the hammer not long after they argued in the garage. He agreed the Defendant's statement was supported by the physical evidence. Chief Brewer agreed that the Defendant's arrangements for the victim's daughter prevented her from discovering the victim's body. Chief Brewer agreed his investigation did not reflect that the Defendant purchased a life insurance policy.

Chief Brewer testified that the Defendant had been permitted to drive the victim's truck and that taking the truck was not the motive to kill the victim. Chief Brewer agreed the Defendant's motive was that they argued and that the Defendant "lost it."

On redirect examination, Chief Brewer testified that the evidence showed the victim was struck five to six times with the hammer, although the Defendant reported striking her twice. Chief Brewer agreed that the Defendant admitted he posed as the victim in the exchange of text messages with Ms. Pruett. Chief Brewer said that if the victim's daughter had discovered the victim on the day of the killing, the Defendant's "crime" would have been discovered earlier.

Lawrence County Sheriff's Investigator Daniel Kellum testified that he responded to the victim's home. He said that blood spatter was on the living room floor, walls, ceiling, couch, and television. He identified photographs, which were received as an exhibit, depicting the victim and the blood spatter. He said that the coroner arrived and removed the blankets covering the victim. He identified photographs, which were received as exhibits, depicting the victim's head wounds. One photograph showed a closeup view of the wound on the forehead, blood on the victim's head, and blood spatter on the couch where the victim lay. Additional photographs of blood droplets surrounding the victim were received as exhibits, as well. Deputy Kellum said that he retrieved the hammer from a bathroom cabinet and that blood and hair were on it. Photographs depicting the hammer and the bathroom were received as an exhibit, along with the hammer.

On cross-examination, Deputy Kellum testified that the victim's home was "in good order" and that he did not see signs of a struggle or fight. He said that during the interview, the Defendant was "[v]ery sad," "meek," and cried at times. Deputy Kellum agreed that the Defendant "could hardly talk" when he spoke about striking the victim

with the hammer. Deputy Kellum agreed that the Defendant was cooperative and remorseful. Deputy Kellum agreed that, other than the number of times the Defendant struck the victim, the Defendant's statement was consistent with the evidence.

Tennessee Bureau of Investigation (TBI) Forensic Scientist Beth Sulpy, an expert in serology and DNA, testified that she analyzed the hammer, the Defendant's clothes and boots, buccal swabs from the living room floor, and a sample of the victim's blood. She said that blood was found on the head of the hammer and on the buccal swabs from the living room floor but that blood was not found on the Defendant's clothes and boots.

TBI Forensic Scientist Dr. Laura Boos, an expert in forensic biology, testified that she analyzed the hammer and buccal swabs from the living room floor for the presence of DNA. Dr. Boos determined that the victim's DNA profile was on the head of the hammer, that a mixture of at least two DNA profiles was found on the handle of the hammer, and that one of the profiles on the handle was male. She said that, upon further testing, she determined a partial Y-STR profile was consistent with the Defendant's DNA profile and that, as a result, she could not exclude the Defendant as the source of the male DNA profile on the handle. Dr. Boos stated that the buccal swabs from the living room floor showed the victim's DNA profile.

Dr. Erin Carney, an expert in forensic pathology, testified that the victim suffered significant blunt force injuries to the head. She said that there was a laceration on the forehead and that the skull was fractured below the laceration. She determined that there were lacerations on the right temple, right ear, right temporoparietal area, and the back of the head. She determined that there were five blunt force injuries on the head and that the base and the right side of the skull were fractured. She determined that the front and right side of the brain were lacerated. She determined that the fracture at the base of the skull extended across the skull, which indicated the use of a large amount of force. She determined, based upon the number of lacerations, that the victim was struck at least five times.

Dr. Carney testified that the she did not find any defensive wounds and that the victim "likely lost consciousness very quickly" because of the severe injury to the brain. Dr. Carney said that the injuries were consistent with the victim's being struck with a hammer. She determined that the cause of death was blunt force trauma. On cross-examination, Dr. Carney testified that the victim's only injuries were blunt force trauma to the head.

Upon this evidence, the jury convicted the Defendant of first degree premediated murder and theft. This appeal followed.

## I.     Sufficiency of the Evidence

-12-

The Defendant contends that the evidence is insufficient to support his convictions. He argues that the evidence failed to establish that he acted with premeditation and that the proof supports a conviction for second degree murder. He also asserts, relative to the theft conviction, that the evidence failed to show that he did not have the victim's effective consent to drive her truck. The State responds that the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A.    First Degree Murder

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. § 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2018) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). "[A] defendant's conscious objective need not be to kill a specific victim." *Millen v. State*, 988 S.W.2d 164, 168 (Tenn. 1999). However, the evidence must establish that a defendant had the "conscious objective to kill a person," meaning that a "defendant intended to cause . . . the death of a person." *Id*. A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the

accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Factors from which a jury may infer premeditation include:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

*State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

In the light most favorable to the State, the evidence reflects that the Defendant and the victim argued inside the garage about financial difficulties and the victim's former husband's belongings remaining inside the victim's home where the Defendant lived. The victim pushed and scratched the Defendant's arm during the argument, but they returned to the living room after the argument, sat on the couch, and began watching television. The Defendant and the victim began arguing again, and the Defendant left the living room, walked through the kitchen to the garage, obtained a hammer, returned to the living room, and struck the victim at least five times on the head with significant force while she sat unarmed on the couch. The victim did not have defensive wounds, and the home was otherwise undisturbed. The evidence reflects that the victim was unable to defend herself from the Defendant's attack. Afterward, the Defendant covered the living room windows in an effort to make the home dark, covered the victim with blankets, hid the hammer, and fled the scene to Mississippi. The Defendant was not under the influence of alcohol on the day of the killing.

The evidence further reflects that after the killing, the Defendant ensured that the victim's body would not be discovered immediately, thereby concealing the killing. He sent text messages from the victim's cell phone to ensure that the victim's younger daughter would not discover the killing until the Defendant had fled the state. The Defendant continued sending messages from the victim's phone the day following the

-14-

killing in order to evade apprehension. The Defendant sent messages from his phone to Mr. Clark in order to divert attention from himself.

Although the Defendant asserts that his expression of remorse and cooperation with the police investigation support a finding that he acted without premeditation, the jury was permitted to evaluate and weigh the Defendant's statement, including his remorse. The Defendant left the living room, walked through the kitchen to the garage, procured a hammer from the garage, returned to the living room, struck the unarmed victim with a deadly weapon while she sat unarmed on the couch, and inflicted significant injuries to the victim's head, including multiple skull fractures and brain lacerations. The Defendant hid the hammer inside the home, fled the state, and concealed the killing. We conclude that a rational jury could have determined beyond a reasonable doubt that the Defendant acted with the conscious objective to cause the victim's death and that his conduct resulted in the victim's death. The evidence also supports the jury's determination that the Defendant acted with premeditation. Therefore, we conclude that the evidence is sufficient to support the Defendant's first degree premeditated murder conviction. He is not entitled to relief on this basis.

## B.     Theft of Property

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). The evidence must show that a defendant "knowingly obtained or exercised control over" the property, "did not have the owner's effective consent," and "intended to deprive the owner of the property." *State v. Amanns*, 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999). An owner is deprived of property when a defendant "withholds property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner." T.C.A. § 39-11-106(a)(8)(A) (2018). The intent to deprive may be based solely upon circumstantial evidence, and a "jury may infer a . . . defendant's intent from the surrounding facts and circumstances." *State v. Roberts,* 943 S.W.2d 403, 410 (Tenn. Crim. App. 1996); *see State v. Scates,* 524 S.W.2d 929, 931 (Tenn. 1975).

In the light most favorable to the State, the evidence reflects that after the killing, the Defendant fled the state in the victim's truck. Although the Defendant, generally, had the victim's effective consent to drive her truck during their relationship, the jury could have inferred from the surrounding facts and circumstances that the Defendant intended to permanently deprive the victim of the truck. The Defendant admitting killing the victim, and he fled the state in her truck. He likewise sent text messages from the victim's phone in an attempt to delay the discovery of the victim's body and to avoid apprehension. The jury could have likewise inferred that the Defendant's permissive use of the truck before he killed the victim did not extend to his continued use of her truck

after he killed her. As a result, we conclude that the evidence is sufficient to support the Defendant's misdemeanor theft conviction. He is not entitled to relief on this basis.

## II. Hearsay Evidence

The Defendant contends that the trial court erred by permitting the State to introduce irrelevant and inadmissible hearsay evidence. He asserts that Ms. Pruett's testimony that the victim intended to end her relationship with the Defendant was irrelevant and inadmissible as evidence of the victim's existing state of mind. Alternatively, he argues that even if the evidence were admissible, it was unfairly prejudicial to the defense. The State responds that the trial court did not abuse its discretion.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally inadmissible except as provided by the rules of evidence or otherwise by law. *Id*. at 802. Tennessee Rule of Evidence 803(3) provides:

Hearsay Exceptions. – The following are not excluded by the hearsay rule:

. . . .

(3) Then Existing Mental, Emotional, or Physical Condition. – A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

A trial court's factual findings and credibility determinations relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Id.*

After jury selection but before the trial began, the State sought to admit evidence during Ms. Pruett's testimony that the victim told Ms. Pruett that the victim had held yard sales to raise money to purchase a bus ticket to send the Defendant back to Mississippi. The State argued that the evidence was admissible hearsay because it showed the victim's existing mental state and her plan or intention to end her relationship with the Defendant. Trial counsel argued that the evidence was inadmissible hearsay and was irrelevant to the issue of premeditation. The trial court determined pursuant to Tennessee Rule of Evidence 803(3) that the evidence was relevant to showing the victim's state of mind and the victim's conduct. The court found that the evidence was not relevant to the Defendant's conduct. Counsel told the court that Ms. Pruett had not mentioned the bus ticket until the week before the trial and that, as a result, the evidence was unreliable hearsay. The court found that counsel could cross-examine Ms. Pruett about her failure to report the victim's statement earlier and that the court would provide a jury instruction about the proper use of the testimony.

After Ms. Pruett's testimony that the victim held yard sales to raise money to purchase a bus ticket to send the Defendant back to Mississippi, the trial court instructed the jury as follows:

> [O]ver the objection by the defense, the Court ruled that this could come in, this statement by the alleged victim to this witness. But only the victim, the alleged victim's conduct and not the defendant's conduct here is provable by this hearsay [exception] that I've just allowed in.

Ms. Pruett's testimony that the victim told her that the victim held yard sales to raise enough money to purchase a bus ticket in order to send the Defendant back to Mississippi was not an express declaration of the victim's mental state but was circumstantial evidence of the victim's feelings toward the Defendant at the time the statement was made. "In order for Rule 803(3) to apply, the declarations of mental condition should expressly assert the declarant's mental state," which "include statements of love ('I love Karen'), fear ('I'm afraid Adolph will kill me'), and hate ('I hate him')." Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.08[3][a] (6th ed. 2011). Further, often "a statement does not literally assert the declarant's mental state when offered to prove that mental state," and as a result, "the statement should be admitted as nonhearsay because it is not admitted to prove its truth." *Id*. However, "circumstantial declarations of mental state . . . are admissible over hearsay objections." *Id*. Nonhearsay encompasses "utterances offered for the underlying implied assertion that is circumstantially implicit in the literal spoken . . . words." *Id*. at § 8.01[8]. As a result, "the truth of the statement is irrelevant."

We conclude that the State offered the victim's statement to prove the truth of the matter asserted and, as a result, was hearsay. Although the trial court determined that the

statement was reflective of the victim's mental state and admissible pursuant to Rule 803(3), we conclude that the statement was not an express assertion of the victim's mental state and was not admissible pursuant to the mental state exception to the rule against hearsay. *See id*. at § 8.08[3][a]; *see also State v. John Parker Roe*, No. 02C01-9702-CR-00054, 1998 WL 7107, at *10-12 (Tenn. Crim. App. Jan. 12, 1998) (determining the victim's statements that the defendant had abused her and had threatened to kill her were not express assertions of the victim's mental state, i.e. fear, although the statements circumstantially implied the victim's mental state and would have been admissible as nonhearsay), *perm. app. denied* (Tenn. Jan. 4, 1999).

The victim's statement, though, was circumstantial evidence of the victim's mental state toward the Defendant at the time the statement was made, and therefore, was admissible as nonhearsay. *See* Tenn. R. Evid. 801(c); Neil P. Cohen et al., at § 8.01[8]; *see also State v. Ricky Lynn Goins*, No. 03C01-9502-CR-00026, 1996 WL 438891, at *7-8 (Tenn. Crim. App. July 30, 1996) (concluding that testimony regarding the defendant's statement that he and the victim were "going to get remarried" was circumstantial evidence of the defendant's mental state toward the victim at the time the statements were made and was admissible as nonhearsay). Although the victim's statement to Ms. Pruett could not be offered to prove the truth of the matter asserted, the statement was admissible for the circumstantial implication that the victim intended to end her relationship with the Defendant. We note that whether the Defendant acted with premeditation was the critical issue in this case and that the evidence was relevant to refuting the Defendant's claims that he acted without premeditation, that he did not know why he killed the victim, and that the situation "just got out of hand." *See* Tenn. R. Evid. 401, 402; *see also State v. Gentry*, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993) ("The motive of a defendant in the commission . . . of a murder is almost always a critical issue."). We also note that the defense cross-examined Ms. Pruett about the victim's statement, Ms. Pruett's failure to report the statement earlier, and Ms. Pruett's having never seen a bus ticket. Therefore, we conclude that although the trial court should not have admitted this evidence pursuant to Rule 803(3), the evidence was nonetheless admissible pursuant to Rule 801(c). We, likewise, conclude that the probative value was not substantially outweighed by the danger of unfair prejudice to the Defendant. *See* Tenn. R. Evid. 403. The Defendant is not entitled to relief on this basis.

### III.    Photographs

The Defendant contends that the trial court erred by admitting two photographs depicting the victim on the couch. He asserts that the photographs were overly gruesome and irrelevant because the defense never disputed the victim's cause of death and that the Defendant caused the victim's injuries. He likewise asserts that the photographs were unnecessary because the medical examiner's testimony sufficiently established the victim's injuries. He argues that the probative value of the photographs was substantially

outweighed by the danger of unfair prejudice.  The State responds that admission of the photographs was proper because they were "substantially probative of premeditation."

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character."  *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978).  When determining the admissibility of such evidence, the trial court should consider

> their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id*. at 951.  Unfair prejudice results when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Dotson*, 450 S.W.3d 1, 91 (Tenn. 2014) (quoting *Banks*, 564 S.W.2d at 950-51).

Before the trial, the State sought to admit five photographs of the victim at the scene.  The photographs depicted the paramedics removing the blankets covering the victim, a closeup view of the victim's head wounds, a view of the victim's face showing an injury to the center of the forehead, the position of the victim's body after it was uncovered by paramedics and blood spatter, and the lack of blood spatter at one end of the couch.  The Defendant objected on the grounds that the photographs were "a bunch of gore" and that the autopsy report provided details about the victim's injuries.  The State argued that the photograph showing blood spatter and the position of the victim's body after it was uncovered were relevant to showing a "void" of blood spatter on one end of the couch.  The trial court permitted the State to introduce the photograph depicting blood spatter and the position of the victim's body after it was uncovered by paramedics.  The court found that the photograph did not show "real close-up of her wounds," which the Defendant admitted causing.  The court likewise found that the photograph was "not as gory as the others" and that its probative value outweighed its prejudicial effect.  The court also permitted the State to introduce the photograph depicting a closeup view of the wound on the forehead.  The court determined that the probative value outweighed the prejudicial effect.  The court excluded the remaining photographs.

During the trial, the State introduced the two photographs.  The first photograph showed the victim lying on the couch after the blankets were removed, blood on the victim's head and couch, and blood spatter on the wall behind the couch.  When the State sought to introduce the photograph of a closeup view of the victim's forehead wound, the defense requested a bench conference out of the jury's hearing.  The transcript reflects that "[a]n off-the-record bench conference was had," the contents of which do not appear

in the record. Afterward, the trial court noted the defense's objection to the photograph before the State published it to the jury. The photograph depicted a closeup view of the wound to the forehead, a significant amount of blood on the victim's head and couch, and blood spatter on the couch where the victim lay.

We conclude that the trial court did not err by admitting the two photographs. The photographs showed the position of the victim's body on the couch as she was discovered and the surrounding blood spatter on the couch and wall. The photographs, likewise, showed that the victim was struck multiple times with significant force. We note that the photographs do not depict any visible defensive wounds, which was consistent with the medical examiner's testimony. Although the photographs depicted the severity of victim's head wounds and a significant amount of blood, they were not overly gruesome given the cause of death. The photographs were probative of and relevant to whether the Defendant acted with premeditation, which was the critical issue for the jury's determination in this case. We further conclude that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice and that the trial court did not abuse its discretion. The Defendant is not entitled to relief on this basis.

### IV. Cumulative Error

The Defendant contends that he is entitled to a new trial due to cumulative error of the evidentiary issues he alleges occurred during the trial. The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

Because we have rejected the Defendant's allegations that the admission of evidence in the form of Ms. Pruett's testimony and the two photographs were error, multiple errors upon which to predicate cumulative error relief do not exist. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE